## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

JAMES THOMAS WHITE,                                    CIVIL NO. 14-240 (MJD/TNL)

       PLAINTIFF,

V.                                                    **REPORT AND RECOMMENDATION**

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

       DEFENDANT.

---

Kari J. Barber, Hoglund, Chwialkowski & Mrozik, PLLC, PO Box 130938, 1781 W. County Road B, Roseville, MN 55113, for Plaintiff; and

Pamela Marentette, Assistant United States Attorney, 600 United States Courthouse, 300 S. 4th Street, Minneapolis, Minnesota 55415, for Defendant.

## I.   INTRODUCTION

Plaintiff James Thomas White brings the present action, disputing Defendant Acting Commissioner of Social Security Carolyn Colvin's denial of his application for disability insurance benefits ("DIB"). This matter is before the Court, United States Magistrate Judge Tony N. Leung, on the parties' cross motions for summary judgment. For the reasons set forth herein, this Court will recommend White's Motion for Summary Judgment (ECF No. 10) be denied, the Commissioner's Motion for Summary Judgment (ECF No. 13) be granted, and this matter be dismissed with prejudice.

## II.    FACTS

### A. Procedural History

White applied for DIB on October 27, 2010, alleging a disability onset date of November 5, 2008. (R. 192.) White's claim was denied initially (R. 64) and upon reconsideration (R. 66). White testified at a hearing before Administrative Law Judge ("ALJ") David B. Washington on May 25, 2012, and November 14, 2012. (R. 36-63.)

In his December 13, 2012 opinion, the ALJ concluded as follows: White met the insured status requirements of the Social Security Act through December 31, 2013. (R. 16.) White has not engaged in substantial gainful activity since November 5, 2008. (R. 16.) White suffered from bilateral carpal tunnel syndrome ("CTS") with bilateral CTS release; neck pain secondary to cervical spondylosis stenosis, status-post remote anterior fusion at C5-6; headaches; bilateral arm pain and paresthesias, likely secondary to degenerative cervical disk disease; myocardial infarct; and obesity. (R. 17.) White does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17.) White has the residual capacity to "perform light work as defined in 20 C.F.R. § 404.1567(b) except no lifting and/or carrying weight of more than 20 pounds occasionally, 10 pounds frequently, no more than occasional overhead work, no frequent fine motor fingering, and no more than occasional use of vibrating equipment." (R. 19.) White was unable to perform any past relevant work, but considering his age, education, work experience, and residual functional capacity, he could perform all or substantially all of the requirements of occupations in security work, either light exertional level or

sedentary exertional level. (R. 29.) The ALJ concluded that White had not been under a disability within the meaning of the Social Security Act since November 5, 2008. (R. 30.) Accordingly, the ALJ denied White's claim on December 13, 2012. (R. 11-35.)

The Appeals Council denied review, (R. 1-6), and White filed the instant suit on January 24, 2014.

### B. Employment Background

White worked for Able Fence Inc. from 1997 to 2008 as a fence installer and a supervisor. (R. 159-61, 261-62.) Fence installer, a heavy skilled position, required White to make various measurements, use power tools, and operate machinery. (R. 262.) Fence installer supervisor, a light skilled position, has the added duties of supervising, training and maintaining records, as well as estimating. (R. 262.) White has not worked since November 2008.

### C. Medical Records

White underwent an anterior C5-6 fusion in 1994 to address C6 radiculopathy and stenosis/spondylosis at C5-6. (*See* R. 301, 303, 426.)

White first sought treatment for headaches and pain on November 12, 2009. (R. 288.) He reported that his bilateral headaches had begun in December 2008. (R. 289.) He complained of neck pain, low back pain, and weakness in both arms, worse on the right. (R. 289.) His gait, reflexes and strength were good, but he showed decreased sensation in all his fingers. (R. 290.) An October 22, 2009 MRI showed moderate degenerative disc bulge at C6-7 with C7 nerve root impingement greater on the left, as well as posterior disc bulge at C3-4 without significant stenosis. (R. 364.)

3

White presented again on December 30, 2009, complaining of neck pain and numbness and tingling in both hands. (R. 287.) His cervical spine films looked stable. (R. 287.) Dr. Richard Gregory opined that White had right carpal tunnel and C7 radiculopathy. (R. 288.) He recommended White have right carpal tunnel surgery, maintain his current lifting restriction of 30 pounds, and suggested a limit on heavy gripping. (R. 288.)

White had medial nerve decompression surgery to address his right carpal tunnel syndrome on February 4, 2010. (R. 280.) White followed up on April 5, 2010, with Dr. Gregory. (R. 285-86.) White noted that he was having less pain in his right hand, and less shooting pains into his fingertips. (R. 285.) An MRI showed that he had foramen stenosis at C6-C7 bilaterally, worse on the left. (R. 286.) Dr. Gregory diagnosed White with bilateral foramen stenosis without radicular pain. (R. 286.) Dr. Gregory recommended against surgery because White was experiencing no radicular pain down his arms; Dr. Gregory also set out a plan that included physical therapy, a functional capacity evaluation, and visits at the pain clinic. (R. 286.)

On July 27, 2010, White presented for another follow-up and complained of neck pain that was causing headaches. (R. 282.) After a physical examination, Dr. Gregory noted a lack of tenderness in the neck and diagnosed White with cervical spondylosis. (R. 283.) Dr. Gregory set out a nonsurgical treatment plan that included a neurological consult. (R. 283.)

White underwent a cervical spine evaluation on August 17, 2010, by Dr. Sherief Mikhail. (R. 300-04.) Dr. Mikhail noted "tenderness in the suboccipital region muscle

tautness and point tenderness along the midportion of the trapezius muscles bilaterally." (R. 302.) Dr. Mikhail also noted "muscle tautness and point tenderness along the paracervical muscles." (R. 302.) White's neck showed significant splinting in the range of motion, and there was discomfort noted with extension, rotation, and lateral bending. (R. 302.) White showed normal bilateral grip and pinch strength, wrist flexion and extension, and elbow flexion and extension. (R. 302.) White's CT scan revealed, *inter alia*: (1) severe infra-adjacent chronic disc degeneration and narrowing at C6-7 including moderate marginal osteophytes, moderate central stenosis, and severe right and moderate left foraminal stenosis; (2) gaseous degeneration of the anterior C4-5 disc interspace with large anterior osteophyte projecting over the superior margin of the screw plate, disc bulge and osteophyte indentation of the right ventral thecal sac which might abut the cord with no foraminal stenosis or facet arthropathy; and (3) C3-4 disc bulge without cord contact or central spinal stenosis. (R. 304.)

At a visit to the pain clinic on September 8, 2010, White reported having no headaches, mild tingling down both arms, and his neck pain was a "tolerable 2" on a scale of 1 to 10. (R. 312.) On September 14, 2010, White reported that he had no headaches or numbness in his arms and hands. (R. 311.) He again rated his neck pain as 2 on a scale of 1 to 10. (R. 311.)

On December 29, 2010, White arrived at the hospital complaining of chest pain. (R. 332.) Doctors diagnosed him with acute myocardial infarction secondary to occluded mid-right coronary artery. (R. 330.) He was treated and released on December 31, 2010. (R. 330.)

On January 6, 2012, White saw Dr. Mark Agre complaining of cervicogenic headaches, neck pain, and hand numbness. (R. 435-37.) Dr. Agre recommended that White obtain a more recent cervical MRI scan and noted that his C6-7 level and stenosis was most of interest. (R. 435, 436.)

In February 2012, a new MRI showed, *inter alia*, at least moderate disc degeneration at C6-7 with loss of disc height and hydration. (R. 417.) The MRI also showed degenerative marrow changes in the bony endplates, mild dorsal spurring, and disc bulging resulting in mild central canal narrowing and slight flattening of the cervical cord without signal change in the cord. (R. 417.) The MRI also showed mild bilateral uncinate spurring right greater than left, resulting in mild narrowing of the right C6-7 foramen with minimal narrowing of the left C6-7 foramen. (R. 417.) Dr. Blake Carlson opined that these changes "potentially could slightly affect the right C7 nerve root." (R. 417.)

White visited Dr. Agre again on February 24, 2012, complaining of cervicogenic headaches, neck pain, and bilateral hand numbness. (R. 430.) Dr. Agre noted that the results from an electrodiagnostic study were abnormal and showed mild bilateral sensory greater than motor, axonal greater than demyelinating median neuropothies across the bilateral wrists, and carpal tunnel syndromes. (R. 430.) Dr. Agre saw no electrodiagnostic evidence for any active cervical radiculopathies. (R. 430.)

White returned to Dr. Agre on February 28, 2012. (R. 426-28.) After reviewing White's recent medical history, Dr. Agre determined that White had advanced cervical spondylosis from his earlier C5-6 fusion, and that he had developed juxtapositional

degenerative disc with persistent bilateral sensory carpal tunnel syndromes at the wrists. (R. 427.) Dr. Agre referred White to Dr. Paul Donahue for a hand surgical opinion and Dr. Lon Lutz for evaluation regarding cervical interventional injection therapy, medical branch blocks/neurotomies series for cervical pain, and cervicogenic headaches. (R. 427.)

White saw Dr. Donahue on May 15, 2012. (R. 513-14.) After reviewing White's records and examining his person, Dr. Donahue diagnosed White with bilateral carpal tunnel syndrome and recurring paresthesias secondary to cervical radiculopathy. (R. 513.) Dr. Donahue also noted that White got some increased paresthesias with arm elevation and Addison maneuver. (R. 513.) Dr. Donahue prescribed and administered cortisone injections for both carpal tunnels. (R. 513-14.)

White returned to Dr. Donahue on June 12, 2012. (R. 517.) White reported no improvement with his symptoms following the cortisone injections, and examination showed mild lower cervical spine tenderness and no significant increase in symptoms with Addison maneuver in his right or left hand. (R. 517.) Donahue diagnosed White with bilateral arm pain and paresthesias secondary to degenerative cervical disk disease and not secondary to CTS. (R. 517.)

### D. Residual Functional Capacity Assessment

Dr. Isaac Marsolek conducted a physical residual functional capacity (RFC) assessment on December 16, 2010.  (R. 316-23.) Dr. Marsolek opined that White could occasionally life 20 pounds, frequently lift 10 pounds, and stand and/or walk with normal break for about 6 hours in an 8 hour work day. (R. 317.) Dr. Marsolek also opined that White's ability to push and/or pull was not limited beyond the limitations on lifting and

carrying. (R. 317.) Dr. Marsolek further opined that White could frequently climb ramps and stairs, occasionally climb ladders/ropes/scaffolds, frequently balance, occasionally stoop, frequently kneel, occasionally crouch, and occasionally crawl. (R. 318.) Dr. Marsolek opined that White should be limited to bilateral reaching only occasionally, but required no visual, communicative, or environmental limitations. (R. 319-20.)

### E.  Administrative Hearings

#### 1.  May 25, 2012 Hearing

The first hearing before the ALJ occurred on May 25, 2012. (R. 51-63.) White testified about his condition as follows: He has ongoing issues with his neck, and he keeps losing arm strength in his hands and his ability to grip. (R. 53.) He experiences headaches sometimes once a week, sometimes once a month, and sometimes as often as ten times a month. (R. 56.) Pills help control some of his headaches, but not all of them. (R. 53.) He received injections to attempt to treat his hands, but he experienced no relief. (R. 53.) He has no trouble walking. (R. 54.) His neck pain shoots down both arms and tingles all the time. (R. 55.) His right arm swells some days. (R. 55.)

As far as his daily routine, White wakes up around 6:00 a.m., tries to have a cup of coffee, and take his two little dogs for a walk. (R. 54.) He walks them about a half mile each way, then goes home to nap. (R. 54.) After that, White mows the grass and tries to do little things around his mobile home, like the dishes. (R. 54.)

Dr. Robert J. Beck testified as a consulting medical expert. (R. 58.) Based on his review, Dr. Beck testified that White's condition did not meet or equal any of the listed disabilities. (R. 58.) Beck opined that White was probably capable of light duty: "20

pounds occasionally, 10 pounds frequently; be able to be six and six on feet," "just occasional overhead work, would need to be away from any kind of vibratory equipment, things like that." (R. 59.) Beck also opined that "probably gripping would be okay, but no frequent fine motor fingering, things like that." (R. 59.)

Because White had very recently seen a new physician, the ALJ left the record open so that White's new medical records could be provided. (R. 61-62.) After the records were provided, the ALJ sent interrogatories to Dr. Beck, and Dr. Beck answered them. (*See* R. 38.)

### 2.  November 14, 2012 Hearing

The hearing resumed on November 14, 2012. (R. 38.) Dr. Beck asked White to describe his issues with his hands. (R. 40.) White said, "They just go numb, and they're weak. I can't grip anything anymore, hold onto anything." (R. 40.) White also confirmed that the issue was in both hands and that earlier injections did nothing to alleviate his symptoms. (R. 40.)

White's counsel then asked Dr. Beck whether, in light of the newly provided medical evidence, White's condition met or equaled a listed disability. (R. 41.) Dr. Beck opined that the objective medical record does not show that White's condition met or equaled a listed disability, but that it would require his RFC to be reduced from light work to sedentary work. (R. 41.) White's counsel asked Dr. Beck exactly which elements of Listing 1.04A were absent. (R. 42.) White's counsel said, "now with the additional evidence, it appears that the numbness and tingling of the upper extremities is actually cervical in nature. [White]'s had the bilateral [CTS]. I'm curious if that would get us to

an equaling because we do have all the elements, it appears to me." (R. 43.) His question

was followed by this exchange:

Dr. Beck:      I'm not sure if there was reflex, positive reflex.

Counsel:       I don't know upon exam if it ever cites to that, but there was the
               motor loss, weakness upon exam, limitation, limited range of
               motion. I don't know if that exam was actually ever performed
               except for there was one test that was performed where he raised his
               arms. There was an exacerbation of his symptoms.

Dr. Beck:      Right. I think they were talking about impingement at that time.

Counsel:       I don't know if that's telling anything.

Dr. Beck:      There's another EMG back in February of '12 that said there is no
               radiculopathy.

Counsel:       Would there be an equaling of the listing without an exam showing
               sensory reflex loss?

Dr. Beck:      From the February '12, it looks like they're saying it's still carpal
               tunnel. There was an EMG done February 24, 2012. The EMG
               shows carpal tunnel syndrome, but no radiculopathy.

ALJ:           Okay. I have to move this case along.

Counsel:       Sure. That's all the questions I have, Judge. Thank you.

(R. 43-44.)

L. David Russell testified as a vocational expert. (R. 44-47.) The ALJ presented

Russell with a hypothetical that assumed a younger person who would be limited to light

level work activity, who would not be able to perform medium or heavy work, who

would be limited to only occasional overhead work, who would not be able to work at a

job that required frequent fine motor fingering, and who would only be able to

occasionally use vibrating equipment. (R. 44-45.) Russell testified that such a person

would not be able to perform any of White's earlier occupations as normally performed. (R. 45.) Russell also testified that such a person could perform security work at either light or sedentary exertional levels. (R. 45.) Russell testified that about 3,000 light exertional level and 1,000 sedentary exertional level security jobs existed in the state of Minnesota. (R. 45.)

White's counsel presented Russell with the same hypothetical person, but further limited him to occasional reaching, handling, feeling, pushing and pulling. (R. 46.) Russell testified that such a person would be able to perform the same jobs he identified to the ALJ. (R. 46.) White's counsel further limited this hypothetical person as follows: limited to lifting 10 pounds occasionally, five pounds frequently; occasionally reaching, handling, feeling, pushing and pulling; occasional overhead working; and occasional use of vibrating equipment. (R. 46.) Russell again testified that such a person would be able to perform the same jobs he identified to the ALJ. (R. 46.) White's counsel asked Russell whether the skills White acquired at his previous jobs could be applicable at the sedentary exertion level. (R. 46-47.) Russell testified that he did not believe so. (R. 47.)

### F. ALJ's Decision

On December 13, 2012, the ALJ issued a decision denying White's claim. (R. 14-30.) In his decision, the ALJ found as follows: White meets the insured status requirements of the Social Security Act through December 31, 2013. (R. 16.) White had not engaged in substantial gainful activity since November 5, 2008. (R. 16.) White had the following severe impairments: bilateral CTS with bilateral CTS release; neck pain secondary to cervical spondylosis stenosis, status-post remote anterior fusion at C5-6;

headaches; bilateral arm pain and paresthesias, likely secondary to degenerative cervical disk disease; myocardial infarct; and obesity. (R. 17.)

The ALJ determined that White does not have an impairment or condition of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part, Subpart P, Appendix 1. (R. 17.) With respect to White's physical symptoms, the ALJ noted that Dr. Beck, the neutral medical expert, "pointed out that the evidence did not clearly evidence a loss of reflex and [White's] EMG in February 2012 demonstrated no radiculopathy." (R. 18.) The ALJ also noted that the limitations of no frequent fine motor fingering and only occasional overhead work and use of vibrating equipments would more than adequately accommodated [sic] the documented limitations." (R. 18.)

After careful consideration, the ALJ determined that White has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), except no lifting and/or carrying weight of more than 20 pounds occasionally, 10 pounds frequently, no more than occasional overhead work, no frequent, fine motor fingering, and no more than occasional use of vibrating equipment. (R. 19.)

The ALJ found that White's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that he cannot find [White] credible that he is incapable of all work because of significant inconsistencies in the record as a whole." (R. 20.) For instance, in December 2008, White complained of weakness in both arms, worse on the right, low back pain going into his right leg, and numbness in all 10 fingers. He did not, however, have any trouble with gait, and he was

post anterior fusion at C5-6. (R. 20.) Ultimately, the ALJ found White credible to the extent that he would experience increased pain and discomfort with strenuous physical activity, more than occasional overhead work or use of vibrating equipment, and frequent fine motor fingering. (R. 20.) After an exhaustive review, however, the ALJ noted that the medical evidence "fails to document any impairment that could be expected to result in the severe, unremitting neck, arm and hand pain and numbness, headaches, and MI symptoms and dysfunction alleged by [White]." (R. 24.)

The ALJ also found it significant that "none of the physicians, specialists or medical clinicians/providers who evaluated, examined or treated [White] has indicated that he was permanently disabled or unable to sustain gainful employment because of his impairments." (R. 24-25.) "To the contrary," he continued, "[White's] treating physicians and specialists have consistently opined that he was capable of a range of light exertional work." (R. 25.) Nonetheless, the ALJ granted White "the benefit of all doubts regarding his subjective complaints" and reduced White's RFC "to include limitations of no frequent fine motor fingering and no more than occasional use of vibrating equipments." (R. 26.) The ALJ also noted that "the lack of reports or documented adverse side effects from medication usage and the claimant's acknowledgement that his medications helped his headaches and neck pain" counseled against placing significant weight on White's claim that his medications caused him to get tired quicker. (R. 26.)

The ALJ placed great weight on the opinions and assessments of Dr. Gregory, White's treating neurosurgeon, and Dr. Koller, White's cardiologist. (R. 26.) As support for this weight determination the ALJ cited to the doctors' opportunity "to evaluate, treat

and manage [White's] carpal tunnel syndrome symptoms and coronary artery disease." (R. 26.) The ALJ also placed great weight on the opinions of Dr. Agre, White's treating physiatrist, "because his conclusions and RFC determination were consistent with his clinical findings and review of recent EMG results and repeat cervical MRI Scan, and the overall evidence of record." (R. 26.)

The ALJ also placed great weight on the opinions of Dr. Beck, the neutral medical expert, and state agency physicians "because of their specialization, familiarity with the disability review process and the opportunity they had to review the evidence of record." As support, the ALJ noted that Dr. Beck had the opportunity to review and opine on the most recent and complete record. (R. 26.) Specifically, the ALJ wrote:

> Based on evidence of record as a whole, with significant weight placed on Dr. Beck's thorough and complete assessment of [White]'s conditions and functioning, his responses to follow up questions posed by the undersigned and counsel, and the fact that his opinion and assessment were consistent with the weight of the medical record as a whole, the undersigned has placed significant weight on Dr. Beck's opinion and has determined that a meeting or equaling of the Listing of Impairments has not been established.

(R. 19.)

The ALJ considered White's age, education, work experience, and RFC and determined that jobs exist in significant numbers in the national economy that he can perform. (R. 29-30.) The ALJ noted that White's "ability to perform all or substantially all of the requirements of [light] work has been impeded by additional limitations." (R. 29.) Even if the ALJ adopted Dr. Beck's opinion that White was limited to jobs at the sedentary exertional level, the ALJ noted that there would remain a significant number of

jobs available in Minnesota that White could perform. (R. 30.) Based on Russell's testimony as vocational expert, the ALJ concluded that, "considering [White's] age, education, work experience, and [RFC], [White] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 30.) The ALJ found that White was not disabled and denied his claim.

## III.   ANALYSIS

### A. Standard of Review

Review by this Court is limited to a determination of whether the ALJ's decision is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "Substantial evidence on the record as a whole, . . . requires a more scrutinizing analysis." *Id.* (quotation omitted).

The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (stating that the ALJ's determination must be affirmed even if substantial evidence would support the opposite finding). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. *Woolf*, 3 F.3d at 1213. Rather, the Court

"must consider both evidence that supports and evidence that detracts from the [ALJ's] decision" and "may not reverse merely because substantial evidence exists for the opposite decision." *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996). If it is possible to reach two inconsistent positions from the evidence, then the court must affirm the ALJ's decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir.1992).

To be entitled to DIB, a claimant must be disabled. 42 U.S.C. § 1382(a)(1). A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905. The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. § 404.1520(a). The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. §§ 404.1520(a), 416.912(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

### B.  Substantial Evidence Supports the ALJ's Decision

White argues (1) the ALJ erred in determining that White was not disabled by improperly applying social security listing of impairment 1.04A; (2) the ALJ improperly substituted his own opinion and failed to apply guideline 201.14 after placing significant weight on Dr. Beck's conclusions; and (3) the ALJ improperly discredited White's subjective complaints.

### 1.  The ALJ Did Not Err in Determining that White Did Not Meet or Medically Equal Listing 1.04A

White first argues that the ALJ's determination that White's impairment does not meet or medically equal listing 1.04A was not based on substantial evidence. Listing 1.04A requires evidence "of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A; *see also Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).

White argues that substantial evidence in his medical records shows cervical spine stenosis with C7 nerve root impingement, as well as a decreased range of motion, muscle weakness, and decreased sensation. Specifically, he relies on (1) lifting restrictions Dr. Gregory imposed in December 2009, (2) the results of a December 2009 strength test showing 5-/5 strength in his left triceps, and (3) the results of a grip-strength test in January 2012. (*See* Pl.'s Mem. in Supp. at 14-16.) For purposes of review, however, the

question is not whether substantial evidence exists to reverse the ALJ's decision—the question is whether substantial evidence exists to *support* the decision. *Vossen*, 612 F.3d at 1015 (citing *Young*, 221 F.3d at 1068); *see also Masterson v. Barhart*, 363 F.3d 731, 736 (8th Cir. 2004) ("It is not our job to reweigh the evidence or review the factual record de novo.").

The ALJ relied on Dr. Beck's testimony at the first hearing that White did not meet or medically equal Listing 1.04A. There, Dr. Beck noted that the record contained no evidence of a compromised nerve root or muscle atrophy. At the second hearing, Dr. Beck maintained that White did not meet or medically equal Listing 1.04A. To support his testimony, Dr. Beck noted that (1) White's February 2012 EMG demonstrated no radiculopathy, and (2) the medical record did not clearly demonstrate a loss of reflex. Moreover, White reported to Dr. Donahue on May 15, 2012, that he had not noticed any weakness in his hands. Dr. Donahue also noted that his examination of White showed "no thenar atrophy or weakness in thumb opposition in either hand." (R. 513.) What muscle weakness White did experience over the course of his treatment was intermittent. Furthermore, White stated at the hearing that the medication "helped control" his headaches and neck pain. (R. 53.)

White also argues that his counsel was not afforded the full opportunity to question Dr. Beck on the question of whether White's ailments met or medically equaled Listing 1.04A. The hearing transcript, however, does not support White's argument. White's counsel questioned Dr. Beck in great detail concerning White's symptoms, their cause, test results, and various physicians' diagnoses. When the ALJ stated that the case

18

had to move along, White's counsel said, "That's all the questions I have." (R. 44.) The ALJ did not stop White's counsel from asking any questions or Dr. Beck from answering any of the questions that he was asked.

After reviewing the medical records and the hearing transcript, the Court determines that there was substantial evidence to support the ALJ's adoption of Dr. Beck's opinion that White did not meet or medically equal Listing 1.04A.

## 2.  The ALJ Did Not Err in Making His RFC Determination

White next argues that the ALJ erred in determining that White had the RFC to perform light work. White argues that after the ALJ relied on Dr. Beck's opinion regarding whether White was disabled, the ALJ improperly inserted his own lay opinion when he disagreed with Dr. Beck concerning White's RFC. *See Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990) (citing *Fowler v. Bower*, 866 F.2d 249, 252 (8th Cir. 1989)) (stating that an ALJ must not substitute his opinions for those of the physician). Importantly, White does not argue that the ALJ ignored evidence. Rather, he argues that the ALJ should have reached a different conclusion based on the evidence in the record.

An ALJ's assessment of a claimant's RFC "must be supported by some medical evidence of the claimant's ability to function in the workplace. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007). An ALJ is not, however, limited to evaluating only the medical evidence when making an RFC determination. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001); *Dykes v. Apfel*, 223, F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved *only* by medical evidence, we disagree."). Moreover, where there are conflicting opinions, "it is the ALJ's

role to resolve conflicts in experts' opinions." *Clay v. Barnhart*, 417 F.3d 922, 930 (8th Cir. 2005) (citing *Bentley v. Shalala*, 52 F.3d 784, 785 (8th Cir. 1995)). A claimant's RFC is "ultimately an administrative determination reserved to the Commissioner." *Cox*, 495 F.3d at 619-20 (citing 20 C.F.R. §§ 416.927(e)(2), 416.946).

The record before the ALJ contained conflicting opinions regarding White's ability to work. In December 2010, Dr. Marsolek opined that White could perform light work. (R. 315.) On April 10, 2012, Dr. Agre opined that White could stand and sit without limitation during an 8-hour work day; never climb nor crawl; occasionally balance, stoop, crouch, and kneel; occasionally reach, handle, feel, and push/pull; and carry 20-30 pounds occasionally and 10 pounds frequently. (R. 457-61.) At the continued administrative hearing in November 2012, Dr. Beck opined that White's description of his symptoms and the evidence in the medical record would reduce White's RFC from light to sedentary starting in April 2012. (R. 41.) The ALJ also noted that the record contained no physician opinion that White was disabled or otherwise unable to work and that White's treating physicians consistently opined that he was capable of light work. (R. 25.)

The record contained conflicting opinions of White's ability to perform various physical activities that directly affected his RFC, including opinions from several of White's physicians at different stages in his treatment. Based on these records and the testimony offered at the administrative hearings, the ALJ determined that White could perform light work with some extra limitations to address White's subjective complaints.

After careful review of the record, the Court determines that the ALJ's RFC determination was supported by substantial evidence in the record.

### 3.  The ALJ Properly Evaluated White's Credibility

Finally, White argues that the ALJ improperly evaluated White's credibility. "The ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence." *Gwalthey v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997) (citation omitted). When evaluating the credibility of a claimant's subjective complaints, the ALJ

> must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by the third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. The [ALJ] is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler*, 739 F.2d 132-, 1321-22 (8th Cir. 1984). "The ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole, but he must give reasons for discrediting the claimant." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004) (internal quotations and citations omitted). "If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment." *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990).

At the outset, the Court notes that the ALJ did not completely disregard White's testimony as not credible. In his opinion, the ALJ "gave [White] the benefit of all doubts

with regard to his subjective complaints of increased arm and hand symptoms along with sensation of tingling and vibrating in the hands" and accordingly reduced his RFC to include limitations of no frequent fine motor fingering and no more than occasional use of vibrating equipment. (R. 26.) Moreover, the ALJ expressly discussed a number of the *Polaski* factors. Specifically, the ALJ noted: (1) White prepares and cooks meals daily, walks his dogs, mows the grass, and is still able to go fishing with his father in the summer and deer hunting with his friends in deer season; (2) White's once daily headaches had become intermittent or infrequent; (3) White would experience increased pain and discomfort with strenuous physical activity, more than occasional overhead work or use of vibrating equipment, and frequent fine motor fingering; (4) the evidence did not show that White's medications were ineffective or produced serious side effects; and (5) White did not complain of and the evidence did not support a finding of symptomatic limitations. In short, the ALJ explicitly discussed each of the *Polaski* factors in making his determination. After careful review of the record, the Court rejects White's final argument and determines that substantial evidence supports the ALJ's credibility determination.

## IV.    CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 13) be **GRANTED**, and this action be **DISMISSED WITH PREJUDICE**.


Date:  February ____6____, 2015              _____*s/ Tony N. Leung*_____
                                             Tony N. Leung
                                             United States Magistrate Judge
                                             District of Minnesota

                                             *White v. Colvin*
                                             File No. 14-cv-240 (MJD/TNL)


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.   This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.   Written objections must be filed with the Court before **February 23, 2015.**